FILED

04/17/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 16, 2019 Session

## CHRISTOPHER LEE SHAW v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County
No. 2011-A-15        Cheryl A. Blackburn, Judge**

_____

## No. M2017-02379-CCA-R3-PC

_____

Christopher Lee Shaw, Petitioner, appeals the Davidson County Criminal Court's denial of post-conviction and error coram nobis relief from his convictions of possession of more than twenty-six grams of cocaine with the intent to sell or deliver within a drug-free zone, evading arrest while operating a motor vehicle, and possession of drug paraphernalia, for which he received an effective sentence of fifteen years in the Tennessee Department of Correction. On appeal, Petitioner contends that he is entitled to post-conviction relief because he was denied the effective assistance of counsel. Specifically, he contends that trial counsel failed to: (1) adequately investigate Adrian Wilkerson; (2) obtain funds to retain a fact investigator to investigate Mr. Wilkerson and an expert witness in undercover narcotics investigations; (3) inform Petitioner that two additional witnesses made out-of-court identifications of Petitioner driving the white Nissan SUV; (4) file a pretrial motion to suppress a suggestive single photographic identification and tainted in-court identification; and (5) ensure a unanimous jury verdict for Petitioner's conviction in Count 1 of the indictment—possession of more than twenty-six grams of cocaine with the intent to sell or deliver within a drug-free zone—by filing a motion for bill of particulars, requesting an election of offenses, and challenging the jury instruction to raise an issue of a unanimous verdict. Petitioner further asserts that the trial court[1] improperly determined that the petition for writ of error coram nobis was time-barred, asserting that he was entitled to due process tolling of the statute of limitations. Following a thorough review, we affirm the trial court's denial of post-conviction and error coram nobis relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

---

[1] Although we typically refer to the trial court as "the post-conviction court" when dealing with post-conviction matters, we will refer to the lower court as "the trial court" throughout this opinion because the case involves both post-conviction and writ of error coram nobis issues.

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

Patrick T. McNally, Nashville, Tennessee, for the appellant, Christopher Lee Shaw.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

*Trial*

On direct appeal, this court summarized the facts presented at trial as follows:

> Ms. Rosetta Williams and Ms. Patricia Taylor, mother and daughter, resided in an apartment complex in Goodlettsville, Tennessee. In January 2010, they contacted the Goodlettsville Police Department (GPD) to report a "problem" with an individual who frequently visited their apartment complex driving different cars. The problem with the individual was not described in any detail at trial. In September 2010, Ms. Williams met with Detective Les Carlisle and was advised to copy the tag numbers of the different cars in an effort to identify the individual. Ms. Williams was also advised to notify the police the next time she observed the individual in the area. Ms. Taylor assisted her mother in collecting the tag numbers of the different cars driven by the individual when he came to their apartment complex.

> Ms. Williams testified that she observed the individual at the complex at least ten times. Ms. Taylor said that she observed the individual at the complex at least three or four times a day. At some point prior to the offense, Detective Carlisle investigated the tag numbers of the cars provided to him by Ms. Williams and determined that they were registered to [Petitioner]. A photograph of [Petitioner] was then shown to Ms. Williams and Ms. Taylor, each of whom identified [Petitioner] as the man they had seen in their apartment complex. One of the cars Ms. Williams had observed [Petitioner] driving while in their complex was a white Nissan SUV with tag number "Titan 18TF03." She had reported the tag number to Detective Carlisle prior to the offense date.

On the day of the offense, Ms. Williams and Ms. Taylor were sitting on Ms. Williams's porch and observed [Petitioner] drive a white SUV into their complex. Ms. Williams observed [Petitioner] exit the white SUV and walk upstairs to the apartment complex. Both Ms. Williams and Ms. Taylor testified that they recognized [Petitioner] and called Detective Carlisle to notify him that [Petitioner] was at the apartment complex. Neither Ms. Williams nor Ms. Taylor recorded the tag number on this occasion, but they identified the car as the same white SUV they had seen [Petitioner] driving on previous occasions in their apartment complex. Later, Ms. Taylor and Ms. Williams watched through the window as [Petitioner] returned to the SUV and began to drive away. Ms. Williams called Detective Carlisle and advised him that [Petitioner] was leaving the apartment complex.

Detective Les Carlisle of the Goodlettsville Police Department testified and confirmed that he investigated a complaint by Ms. Williams concerning an individual frequenting her apartment complex. In response to Ms. Williams's concerns, Detective Carlisle advised her to copy the tag numbers of the different cars and to notify him the next time the individual was at her apartment complex. He confirmed that [Petitioner] was later identified as the subject of Ms. Williams's complaint. On the day of the offense, Detective Carlisle received a phone call from Ms. Williams and, along with Detective Joseph Bardeal, he drove to her apartment complex in an unmarked car. Detective Carlisle also called Sergeant Gene Martin of the Metropolitan Police Department, who was already familiar with the investigation and identity of [Petitioner], and requested the assistance of additional marked police cars.

Detective Carlisle received another phone call from Ms. Williams as he neared the apartment complex exit. She advised him that [Petitioner] was leaving the complex. He then observed [Petitioner] driving out of the complex in a white SUV. Detective Carlisle testified that [Petitioner] was the only person in the SUV. He followed the white SUV south on Dickerson Road and verified its tag number as one previously given to him by Ms. Williams. Detective Carlisle then called Sergeant Martin to coordinate a plan to initiate a traffic stop of [Petitioner's] SUV.

Detective Carlisle continued to follow the white SUV in a northbound direction to an intersection, and Sergeant Martin and other uniformed officers were waiting for [Petitioner] in the southbound direction on the other side of the intersection. Sergeant Martin and Detective

Carlisle surrounded [Petitioner] and activated their blue lights. Sergeant Martin's car was in front of the SUV, and Detective Carlisle's car was behind the SUV. Detective Carlisle testified that [Petitioner] "paus[ed] just for a few seconds . . . pull[ed] around [a] police car, and [took] off." Detective Carlisle followed the SUV until [Petitioner] turned left off of Brick Church Pike, at which point he lost sight of the car. A white SUV, which Detective Carlisle confirmed as the same SUV driven by [Petitioner], later crashed into a nearby fire hydrant. [Petitioner] was not present at the scene. After a short foot chase, [Petitioner] was arrested in a creek behind a residential area. Detective Carlisle identified [Petitioner] as the driver of the white SUV that had crashed into the fire hydrant.

On cross-examination, Detective Carlisle acknowledged that the white SUV was not registered to [Petitioner]. He had no knowledge of the owner of the car or of who drove it earlier that day.

Officer Mike Wilson testified that he was familiar with the investigation and [Petitioner's] identity in October 2010. On the day of the offense, Officer Wilson was in uniform, drove a marked police car, and participated in the search and pursuit of [Petitioner]. He testified that [Petitioner] was the driver of the white SUV and that he did not observe any other occupants inside the SUV. When Officer Wilson attempted to block [Petitioner's] SUV, [Petitioner] "stopped for a split second and then drove around us and began driving erratically away." Officer Wilson continued to follow [Petitioner] but eventually lost sight of the SUV.

After turning onto a few residential streets in the area, Officer Wilson observed the same white SUV after it had crashed into a fire hydrant at the intersection of Oak Valley Drive and Oak Ridge Drive. Officer Wilson testified that [Petitioner] was no longer in the SUV. He further estimated that there were "two minutes at the most" between the moment when [Petitioner] initially evaded the police and the moment when he saw the wrecked SUV at the fire hydrant. Five minutes after Officer Wilson arrived at the scene of the wreck, [Petitioner] was apprehended "a block or two away." [Petitioner] was brought back to the scene of the wreck, and Officer Wilson identified him as the driver of the SUV that had crashed into the fire hydrant.

Officer Wilson conducted a search of the SUV and recovered a round piece of crack cocaine, a baggy of cocaine powder, and a set of digital scales. He said the baggy of cocaine powder "was still compressed

- 4 -

and appeared to have been chipped off of a kilo block." The bag of cocaine powder was plainly visible in the front console, the piece of crack cocaine was in a cup holder wrapped in a paper towel, and the scales were in the passenger side front floorboard. A field test of each item was positive for cocaine base. The powder cocaine weighed 7.8 grams, and the crack cocaine weighed 32.5 grams. Officer Wilson also field tested a substance recovered from [Petitioner's] pants, which was positive for cocaine base and weighed 3.5 grams. He stated that $1,070.00 was taken from [Petitioner's] person in the following denominations: three $100 bills; thirty-five $20 bills; four $10 bills; and six $5 bills.

On cross-examination, Officer Wilson testified that he also found a traffic ticket issued to Adrian Wilkerson, a known drug dealer. He was unable to determine where the digital scales that were recovered from the SUV were located before it crashed into the fire hydrant, and he agreed that the scales may have shifted during the crash. Officer Wilson further agreed that the driver of the SUV may have been unaware of the presence of the crack cocaine because it was wrapped in a paper towel. Finally, Officer Wilson said he did not subject the items recovered from the SUV to fingerprint analysis or testing.

Detective Christopher Jones testified that on the day of the offense he and his partner, Officer Truan, participated in the search of [Petitioner] following the wreck involving the white SUV. Detective Jones said he heard from radio dispatch that [Petitioner] "had bailed on foot somewhere off Oakwood off Dickerson Road." His squad car was equipped with computer equipment which enabled him to retrieve a description and photograph of [Petitioner]. He heard from dispatch that [Petitioner] had been observed in the backyard of a residential area and proceeded in that direction. As he approached the area, he observed [Petitioner], seated in another car, a light colored Lincoln Mark VIII, at the intersection of Larkspur and Ewing Street. A female was driving the car, [Petitioner] was in the front passenger seat, and another female passenger was in the backseat.

Detective Jones activated his lights and siren, and [Petitioner] jumped out of the car and began to run. Detective Jones initially followed [Petitioner] in his car, and his partner chased [Petitioner] on foot. They attempted to "box in" [Petitioner]; however, the female driver of the Lincoln obstructed the pathway of Detective Jones's squad car. Consequently, Detective Jones lost control of his car and crashed into a

rock wall. He then chased [Petitioner] on foot behind a creek and unsuccessfully deployed his taser. Detective Jones said that he eventually grabbed [Petitioner], pulled him to the ground, and took him into custody.

Ms. Linda Williams testified that she worked at Martha's Learning Enrichment Center, a daycare center located at 108 Oak Valley Drive, Nashville, Tennessee. On the day of the offense, Martha's Learning Enrichment Center was an active, operating daycare center. Mr. David Kline, an employee of the Metropolitan Nashville Planning Department, testified that three different day care centers, including Martha's Learning Enrichment Center, were located "exactly" 1,000 feet from the intersection of Oak Valley Drive and Oak Ridge Drive.

The testimony of Sergeant Gene Martin corroborated in large part the testimonies of Detective Carlisle and Officer Wilson regarding the events leading up to the offense. Sergeant Martin also testified that on the day of the offense he was contacted by Detective Carlisle and participated in the search and pursuit of [Petitioner]. He issued a radio advisory, which contained [Petitioner's] name, appearance, and location. During the traffic stop, Sergeant Martin observed an individual driving the SUV but was unable to confirm his identity. He said Officer Wilson was closer to the SUV and had a better view of the driver. Officer Martin said that after the SUV sped away, he did not observe [Petitioner] until after he was in custody. He described [Petitioner] as "soaked and dirty" and "tired . . . like he had just been running." He said that [Petitioner's] pants were soaked and fell down to his ankles. He took [Petitioner's] pants off and gave them to Officer Alan Earls.

Sergeant Martin confirmed that [Petitioner] did not own the SUV, a Nissan Armada, and that it was not stolen. He testified that the SUV was not registered to [Petitioner] and that it was never claimed by anyone after the wreck. He explained that he did not require the "I.D. Unit" to process the SUV:

> [W]e knew the subject that was driving the vehicle. He was being followed to a point. And then Officer Wilson and myself followed him to another point. And then we followed him to the next point in the creek. It was a matter of minutes. So we knew who was going to be driving the vehicle and who was in the vehicle, who had got out of the vehicle. So . . . there was not a need to process the vehicle.

- 6 -

Finally, Sergeant Martin said that, in his experience, processing a vehicle did not always result in fingerprints.

Officer Alan Earls searched [Petitioner's] pants and found "a large wad of money" and a baggy containing a white, powdery, rock-like substance. Officer Earls testified that the substance appeared to be drugs. He took a photograph of the money, which was shown to the jury. He gave the money and the powdery substance to Officer John Tuberville, who later gave them to Officer Wilson. Officer Earls described a series of photographs taken of [Petitioner] after his arrest. The photographs showed [Petitioner], dressed in his boxer shorts, immediately after he had vomited. Officer Earls said, in his experience, it was common for an individual to vomit after ingesting drugs and running from the police.

Officer John Tuberville testified that he participated in the search and pursuit of [Petitioner] on the day of the offense. After receiving information from the other officers that the suspect was running through a creek, he drove up a driveway in the residential area near the scene of the wrecked SUV. He observed Officer Traun and Sergeant Martin take [Petitioner] into custody. He confirmed that 3.5 grams of powder cocaine and $1,075.00 were recovered from [Petitioner]. He drove back to the scene of the wreck and gave the drugs and money to Officer Wilson. While at the scene, [Petitioner] vomited and "started going into convulsions, having muscle spasms that were uncontrollable." Officer Tuberville called an ambulance, and [Petitioner] was taken to the hospital. Officer Tuberville later obtained warrants for [Petitioner's] arrest. Officer Tuberville's arrest report indicated that [Petitioner] replied "none" for his place of employment. It also noted the tag number of the SUV, which included the symbol "TF" indicating a Titans fan.

Isaac Martinez of the Davidson County Metropolitan Police Department Property and Evidence Division confirmed that Officer Wilson submitted $1,070.00 in cash, drugs, and drug paraphernalia to the property room in connection with this case. The money was initially stored in a safe and later deposited into a bank or treasury department account. He stated that the drugs were initially sealed and placed in a secure location. In response to a request from the District Attorney's Office, he submitted the drugs to the Tennessee Bureau of Investigation ("TBI") Crime Lab for testing and analysis. He confirmed that he picked up the sealed bags containing the drugs following testing.

Agent John Scott of the Tennessee Bureau of Investigation testified as an expert in the area of forensic chemistry. The larger, solid chunk of crack cocaine recovered from the SUV and the substance recovered from [Petitioner's] pants testified positive for cocaine base and weighed 28.82 grams and 1.41 grams, respectively. Agent Scott added the individual weight of each drug and "round [ed] off" or "truncated" it to arrive at a total combined weight of 30.2 grams. The white powdery substance recovered from the SUV tested positive for the presence of cocaine and weighed 6.8 grams.

William Mackall, a lieutenant with the Narcotics Interdiction Unit and DEA Task Force, testified as an expert in the field of undercover narcotics investigations. He distinguished between crack cocaine users and sellers and said that users "always [had] a crack pipe on them" and did not have money with them. He further opined that [Petitioner] intended to sell or deliver the drugs recovered in this case based on the amount and appearance of the drugs, the amount and denominations of the cash recovered from [Petitioner], and the presence of the digital scales. On cross-examination, Lieutenant Mackall conceded that he had seen drug users, who were not sellers, with large amounts of money. Additionally, he testified that 1.41 grams of cocaine, the equivalent of 6 or 7 "hits," was not an unreasonable amount for a user to purchase.

By stipulation, the parties agreed that Officer Thomas Simpkins of the Metropolitan Nashville Police Department analyzed the evidence in relation to this case and that "no prints were developed from any of the items submitted."

Ms. Lauren Rolston testified on behalf of [Petitioner]. She lived in the same apartment complex as Ms. Williams and Ms. Taylor. She "knew of [Petitioner]" because they grew up in the same neighborhood. She testified that she had never seen [Petitioner] driving a white Nissan SUV in her apartment complex. Ms. Rolston explained that she did hair for extra money at her apartment. She specialized in "locks or dreds" and identified several photographs of African American men with that type of hairstyle. She testified that Mr. Wilkerson, the registered owner of the wrecked SUV, was a hair client of hers and the father of her best friend's son. She said he "always" visited her apartment in October 2010. She was certain that [Petitioner] was not in her apartment complex on the day of the offense.

Ms. Amber Phillips, another friend of [Petitioner's], testified that [Petitioner] spent the night at her home on October 6, 2010, and was with her all morning. She said he then rode in her car, a cream-colored Infiniti J30, to pick up a mechanic. Phillips said that the money recovered from [Petitioner] was intended to pay the mechanic for repairs to her car. When the police approached her car with their blue lights on, [Petitioner] jumped out of the car without explanation.

Based on the above proof, the jury convicted [Petitioner] of possession of more than twenty-six grams of cocaine with the intent to sell or deliver within 1,000 feet of a child care agency, evading arrest while operating a motor vehicle, and possession of drug paraphernalia.

*State v. Christopher Lee Shaw*, No. M2012-01437-CCA-R3-CD, 2013 WL 5310489, at *1-6 (Tenn. Crim. App. Sept. 20, 2013), *perm. app. denied* (Tenn. Dec. 23, 2013) (footnote omitted). This court affirmed Petitioner's convictions. *Id.* at *1. Thereafter, the Tennessee Supreme Court denied Petitioner's application for further review. *Id.*

### Post-Conviction and Error Coram Nobis Proceedings

On December 22, 2014, Petitioner filed a timely petition for post-conviction relief, alleging that he received ineffective assistance of counsel. He filed amended petitions for post-conviction relief on February 25, 2016, and March 30, 2017. Additionally, he filed a petition for writ of error coram nobis on October 25, 2016. In his petition for writ of error coram nobis, Petitioner acknowledged that the petition was untimely filed but asserted that he was entitled to due process tolling.

At a hearing on the petitions, Adrian Wilkerson testified that he was incarcerated at Northwest Correctional Facility but thereafter repeatedly invoked his Fifth Amendment right to remain silent, refusing to indicate if he went to post-conviction counsel's office to prepare the affidavit and refusing to identify whether his signature appeared on the document.

Peggy Hayden testified that she was previously employed by post-conviction counsel as a legal assistant and was commissioned as a notary public. Ms. Hayden identified an affidavit signed by Mr. Wilkerson, which she notarized. She stated that the information in the affidavit was sworn to and subscribed before her by Mr. Wilkerson on January 13, 2016. In the affidavit, Mr. Wilkerson admitted that he drove the white Nissan SUV on October 7, 2010 and claimed ownership of the powder and crack cocaine in the SUV. He said that he used the SUV before Petitioner and that he left the drugs in the vehicle. Mr. Wilkerson further stated that he was charged with multiple drug offenses

- 9 -

at the time "of these events" and that his attorney instructed him not to speak to Petitioner's trial counsel. Ms. Hayden testified that she notarized the affidavit at post-conviction counsel's office and that Mr. Wilkerson's attorney was not present at the time.

Scott Cothran, a private investigator, testified as an expert in undercover narcotics. Mr. Cothran explained that he was an officer with the Metropolitan Police Department for over sixteen years and worked in the Crime Suppression Unit, which was a "street level drug unit where [he was] responsible for street level dealers and prostitution." He stated that he had also been involved in a number of "major" drug buys and in breaking up large-scale drug operations. Mr. Cothran testified that he was retained by post-conviction counsel to review the trial testimony of Lieutenant Mackall, the preliminary hearing transcript, photographs, and the lab reports prepared by the TBI. He stated that, although Lieutenant Mackall testified that "about ninety percent of crack users were found in possession of crack pipes[,]" he "found that number to be high[.]" Mr. Cothran stated that, in his experience, only "around sixty percent" of crack users were arrested with crack pipes. He further testified that it was "not uncommon" for drug buyers to have scales because they "don't want to get ripped off[.]" Mr. Cothran said that 1.41 grams of cocaine base found on Petitioner at the time of his arrest "could be for personal use," explaining that the amount could equal three to five uses depending "on the person, their tolerance, their addiction level[.]"

On cross-examination, Mr. Cothran testified that he was still employed with the police department at the time of Petitioner's trial on January 23, 2012. He further testified that, when taking into consideration the "thirty or so grams" of drugs found in the white Nissan SUV along with the drugs found on Petitioner at the time of his arrest, he would opine that the amount had been for resale and not personal use.

Petitioner testified that, while awaiting trial in the instant case, he was incarcerated on a parole violation. He explained that, in October 2011, he retained trial counsel to represent him on the current charges in criminal court but that he had been represented by another attorney in general sessions court. According to Petitioner, trial counsel met with him two times at the facility where he was housed prior to trial, but Petitioner did not meet with trial counsel in court until the day of his trial. Petitioner recalled that he and trial counsel discussed defense strategy, which was "to put on proof that [Petitioner] was not driving [the white Nissan SUV] and that the drugs were not [Petitioner's]." Petitioner explained that he and trial counsel developed this strategy because "there were no out-of-court identifications of [Petitioner]" and "[n]o one could . . . say that [Petitioner] was in [the] vehicle." Petitioner acknowledged that his original attorney filed a motion for discovery and that he reviewed the State's response with his original attorney and with trial counsel. Petitioner testified that the State's initial discovery response filed in April 2011 indicated that there were no known witnesses who made a pretrial identification of

Petitioner. Petitioner acknowledged that he and trial counsel reviewed the police reports and affidavits provided by the State's discovery response.

Petitioner recalled that the trial court held a 404(b) hearing on Friday, January 20, 2012, three days before his trial began. He stated that Ms. Williams testified during the hearing, and he learned that Ms. Williams and her daughter, Ms. Taylor, had previously identified Petitioner "as being at the apartments" and driving the SUV at the time of the incident that led to Petitioner's arrest. Petitioner asserted that this was the "first [he] heard of that[,]" and he claimed that he had never had any prior "dealings with" Ms. Williams and Ms. Taylor. Petitioner testified that, based upon Ms. Williams' testimony at the 404(b) hearing, he decided that he needed to "make a plea deal come Monday morning." He recalled that trial counsel approached the State about a plea deal, but trial counsel reported that "nothing was on the table at that time." Petitioner stated that he did not discuss with trial counsel the possibility of suppressing Ms. Williams' identification or changing the defense strategy at trial. Additionally, he and trial counsel did not discuss obtaining a continuance after learning of the proposed testimony of Ms. Williams at the 404(b) hearing.

On cross-examination, Petitioner acknowledged that he had a preliminary hearing in general sessions court, during which the State called officers who testified that they saw Petitioner driving the SUV. Petitioner agreed that trial counsel filed a notice of alibi and that his alibi witness, Amber Phillips, testified on his behalf at trial. Petitioner further agreed that he and trial counsel discussed Mr. Wilkerson prior to trial. He stated that he asked trial counsel to "do some research with [Mr.] Wilkerson about the traffic ticket that was found in the [SUV]." Petitioner testified, however, that trial counsel did not have adequate time to "do the extensive research that he needed to do" on Mr. Wilkerson before trial. Petitioner agreed that trial counsel filed a motion to suppress his statements to police, in which Petitioner admitted that he had been driving the SUV, and that, based on the motion to suppress, the State agreed not to introduce Petitioner's admission that he was the driver of the SUV. Petitioner denied ever seeing the State's supplemental response to the motion for discovery that was filed in December 2011, which included the statements of Ms. Williams and Ms. Taylor.

Trial counsel testified that he was retained to represent Petitioner at the end of September 2011. He explained that he had been a practicing attorney since 2002 and that in 2011 "at least fifty to sixty percent of the overall workload in [his] office" was dedicated to criminal defense. Trial counsel recalled that he obtained a copy of the State's initial discovery response from the court file after he filed a notice of appearance on Petitioner's behalf. Trial counsel testified that he later received supplemental discovery responses from the State that were filed in October and December 2011. Trial counsel said that he met with Petitioner at each of the three scheduled court appearances

prior to trial, and he visited Petitioner three or four times at the prison where Petitioner was housed.

Trial counsel testified that he and Petitioner talked about Mr. Wilkerson, and trial counsel drafted an examination for Mr. Wilkerson "had [they] chosen to use that at trial." However, trial counsel explained that Mr. Wilkerson "had his own criminal issues at that point in time" and that he could not have spoken to Mr. Wilkerson without his attorney present. Trial counsel informed Petitioner that he "could not foresee any circumstance where Mr. Wilkerson would claim the drugs on the [witness] stand" and that he did not believe that relying on Mr. Wilkerson to claim ownership of the drugs "would be an effective defense for [Petitioner]."

Trial counsel confirmed that he did not request funds to retain a narcotics expert to rebut Lieutenant Mackall's testimony because Petitioner's family indicated that they could not afford an expert in addition to paying for trial counsel's services. Because Petitioner's family had retained counsel, trial counsel did not believe that the trial court would approve funds to retain an expert under Tennessee Supreme Court Rule 13. In addition, trial counsel believed that cross-examining Lieutenant Mackall was comparable to having a competing expert provide rebuttal testimony.

Trial counsel recalled that Ms. Williams and Ms. Taylor were late-disclosed witnesses for the State; they did not become known to the defense until the supplemental discovery response filed on December 1, 2011. Trial counsel explained that the supplemental discovery response led him to request the 404(b) hearing, but the trial court ultimately decided that the witnesses' testimony was admissible. Following the trial court's ruling, Petitioner indicated that he was open to a plea deal, but the prosecutor informed trial counsel that "all offers [were] off the table[.]" Trial counsel testified:

> At that point we were left with essentially two options. We could proceed to trial as scheduled. At that point in time [Petitioner] had been waiting for a while. Or I could move to continue the case. Based upon what the defense was going to be and the fact that we had a potential alibi coming in, another witness that would testify that Mr. Wilkerson was the one who had been driving the vehicle, and based upon the testimony Ms. Williams gave at the . . . 404(b) hearing[,] I thought she was going to be subject to cross-examination to call her identification into question. But at that point in time[,] it made more sense to go ahead and proceed with the trial because based upon our conversations[,] I don't know any other witnesses or anybody else we would have called to rebut that had we continued the case.

- 12 -

Trial counsel testified that he saw no need to request an election of offenses at the close of the State's proof. Additionally, he did not file a motion for a bill of particulars because based upon the discovery and information in the indictment, trial counsel "knew exactly what [Petitioner] was being charged with and the quantities and the location and the date." Trial counsel recalled that Petitioner decided not to testify primarily because if Petitioner testified that he was not in the white Nissan SUV, the trial court would have likely allowed the State to present as impeachment evidence that Petitioner admitted to police he was the driver of the SUV. Trial counsel continued, "And at that point the whole defense kind of goes up because we're bringing alibi witnesses and people to testify that he wasn't driving the car. If a jury hears a statement that he allegedly admitted he was in the car, that's kind of the end of your day."

On cross-examination, trial counsel agreed that, following the 404(b) hearing, he did not file a motion to suppress the photographic identification of Petitioner. He further acknowledged that he did not apply for funds to hire an investigator. Trial counsel stated that he did not believe an investigator was necessary because "[w]e were aware of what the officers' testimony was going to be[,]" and trial counsel thought their testimony "could be handled through cross-examination." Trial counsel stated that he did not research whether Mr. Wilkerson was the owner of the SUV. He explained:

> It was actually better for us at trial given the way we were proceeding if that person wasn't -- we had both [Mr.] Wilkerson who we know there was a ticket in the vehicle with his name and then potentially even somebody else. And it was our theory that the more people who could have been driving in that vehicle the more people other than [Petitioner] could have been the ones to put that . . . cocaine in there.

Trial counsel testified that he spoke to Mr. Wilkerson's attorney at an early court appearance and asked if he could speak to Mr. Wilkerson. Trial counsel recalled, "And I think the answer was not just no but hell no."

Appellate counsel testified that he had been licensed to practice law since 1996 and that he was in private practice in 2012, "doing mostly . . . criminal defense appellate work." Appellate counsel was retained to represent Petitioner at the motion for new trial hearing and on appeal and recalled that he met with Petitioner a few times prior to filing the appeal. He explained that Petitioner challenged the sufficiency of the evidence on appeal but that the appellate court affirmed the judgments of conviction.

On cross-examination, appellate counsel agreed that succeeding on a challenge to the sufficiency of the evidence on appeal was typically unlikely. Appellate counsel agreed that courts have expressed concern over single photo identification. He also

agreed that the issue was not raised on appeal or preserved in the motion for new trial. In regard to appealing issues as to the jury instructions, appellate counsel stated that he believed the law required any objections to jury instructions to be filed in writing and that because no written objections were filed by trial counsel, any challenge on appeal would have been reviewed only for plain error. Appellate counsel testified that he had previously pursued a number of appeals in which he raised claims under plain error review.

*Trial Court's Ruling*

At the conclusion of the hearing, the trial court took the matter under advisement. The court later filed an extensive written order with findings of fact and conclusions of law. In denying post-conviction relief, the trial court determined that Petitioner failed to establish he was denied the effective assistance of counsel. As to Petitioner's claim that trial counsel failed to investigate Mr. Wilkerson, the trial court found:

> When [t]rial [c]ounsel was questioned about this issue, he testified that he was aware of [Mr.] Wilkerson who had charges pending at the same time. Trial [c]ounsel testified he spoke with Mr. Wilkerson's counsel, . . . but [Mr. Wilkerson's counsel] advised his client would not speak with [t]rial [c]ounsel. This Court credits the testimony of [t]rial [c]ounsel. Moreover, Petitioner has failed to establish how he was prejudiced by this alleged deficiency. Information concerning Mr. Wilkerson was before the jury as evidenced in the record and Petitioner's citations thereof. Specifically, the trial record shows that [t]rial [c]ounsel cross[-]examined witnesses about Mr. Wilkerson to establish he was the owner of the [white Nissan SUV].

(citation omitted).

Additionally, the trial court concluded that counsel was not deficient for failing to offer an expert to rebut the State's expert proof that the amount of cocaine possessed by Petitioner was evidence of an intent to sell the drugs. The trial court reasoned:

> At the post-conviction hearing, the Petitioner presented one proposed defense expert, former Metro Officer Scott Cothran, who testified as to the quantity of controlled substance seized and what it could mean as far as personal use versus sale.
>
> As to the quantity of drugs recovered and whether the amount is indicative of resale, Petitioner presented the testimony of former Metro

- 14 -

Officer Scott Cothran. Although Mr. Cothran spoke highly of his former supervisor, [Lieutenant] Mackall, Mr. Cothran testified his opinion differed as to the number of crack cocaine users being seized while in possession of a crack pipe. Additionally, Mr. Cothran testified the amount of money seized from Petitioner did not seem like a high amount and the 1.41 grams seized from Petitioner also "was not a large amount" and "could have been for personal use" depending on the person's tolerance and addiction level.

As pointed out by the State during its cross-examination of Mr. Cothran, when Petitioner's case was tried in January 2012, Mr. Cothran still was employed by the Metro Nashville Police Department and would not have been available as defense expert. However, even had he testified, Mr. Cothran was unable to definitively say the amount could not have been for resale. His testimony was the Petitioner possessed "not a high amount" of money and that the 1.41 grams—the amount recovered from Petitioner's person in addition to the amount recovered from the vehicle—"could have been for personal use" with the caveat it depended on the individual's addiction or tolerance level. This information is similar to what [t]rial [c]ounsel elicited from [Lieutenant] Mackall at trial through cross-examination. After the portion of the appellate opinion quoted by Petitioner above, the Court of Criminal Appeals noted:

> On cross-examination, Lieutenant Mackall conceded that he had seen drug users, who were not sellers, with large amounts of money. Additionally, he testified that 1.41 grams of cocaine, the equivalent of 6 or 7 "hits," was not an unreasonable amount for a user to purchase.

Accordingly, the Court finds that Petitioner has not established by clear and convincing evidence that the outcome of the trial would have been different if [t]rial [c]ounsel called Mr. Cothran—or someone else who would testify as did Mr. Cothran at the evidentiary hearing—as an expert witness at trial.[2] Moreover, [t]rial [c]ounsel testified at the post-conviction hearing that at the time of the trial, Petitioner's family was not in a position financially to retain expert services nor did [t]rial [c]ounsel believe the trial court would

---

[2] We note that the trial court applied an incorrect standard, *i.e.*, clear and convincing evidence, in evaluating whether Petitioner established prejudice. The proper standard is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Nevertheless, as explained below, we reach the same conclusion that Petitioner failed to establish prejudice under the *Strickland* standard.

- 15 -

have approved expert funds pursuant to Rule 13 of the Tennessee Supreme Court Rules. . . . This Court credits the testimony of [t]rial [c]ounsel.

Regarding the motion to suppress the pretrial identification by Ms. Williams, the trial court determined that

> [t]rial [c]ounsel testified that the State gave pre-trial notice of the identifications made by Ms. Williams and Ms. Taylor. Trial [c]ounsel testified the State's notice prompted him to file his 404(b) motion, which resulted in the pre-trial hearing on January 20, 2012, addressing whether evidence of the outstanding warrants on harassment and the parole violation could be introduced at trial. Information about the single photo identification was placed on the record during Detective Les Carlisle's testimony at the January 20 hearing. Trial [c]ounsel testified that at the time he was aware of case law regarding single-[photo] identifications and conceded that Petitioner would benefit had the identification been suppressed, but [t]rial [c]ounsel did not believe a motion to suppress would be successful based on the evidence. This Court credits [t]rial [c]ounsel's testimony. Moreover, Petitioner has not demonstrated a suppression motion would have been meritorious nor has he presented evidence to support the other pre-trial motions referenced in his petition.

(citation and footnote omitted). The trial court found that Petitioner failed to show that trial counsel's performance was deficient for not filing the referenced pretrial motions and that he was prejudiced by any alleged deficiency.

Regarding Petitioner's claim that trial counsel failed to file a pretrial motion for a bill of particulars and a motion challenging the defective indictment, the trial court found that Petitioner's complaints lacked merit. The trial court concluded, "Trial [c]ounsel testified a bill of particulars was not necessary in this case because the indictment provided sufficient notice of the charges contained therein. This Court credits [trial] counsel's testimony." The trial court also found that trial counsel was not deficient in failing to seek an effective election of offenses. The trial court determined that the unpublished case relied on by Petitioner—*Gregory Justice v. State*, No. M2012-00183-CCA-R3-PC, 2013 WL 1965999, at *1 (Tenn. Crim. App. May 13, 2013), *perm. app. denied* (Tenn. Oct. 16, 2013)—did not support Petitioner's claim. The trial court reasoned that "*[Gregory] Justice* . . . holds the opposite: when charged with the offenses of possession with intent to sell or deliver, the defendant is charged with one offense; thus, no basis exists for the State to make an election."

- 16 -

In denying the petition for writ of error coram nobis, the trial court found that the petition was not timely filed. The trial court ruled:

> The statute of limitations for seeking a writ of error coram nobis is one year from the date the judgment becomes final in the trial court—not one year after the final action in the highest court as with a post-conviction petition. TENN. CODE ANN. §§ 40-26-105, 27-7-103; *Mixon*, 983 S.W.2d at 671. Here, Petitioner's judgment became final in the trial court after the verdict in early 2012, but the petition for a writ of error coram nobis was not filed until October 25, 2016, during the pendency of the post[-]conviction proceeding.

The trial court considered whether principles of due process precluded the use of the statute of limitations to bar Petitioner's coram nobis claim but determined that "[n]othing in the record implicates any due process concerns that would require tolling the statute of limitations[.]" The trial court reasoned:

> [T]he evidence was not "later-arising" since it was available pretrial and during the statutory limitations period . . . . Likewise, the "evidence" concerning [Mr.] Wilkerson does not constitute "newly discovered evidence." The parties knew of [Mr.] Wilkerson prior to trial and he was referenced during the trial testimony.
>
> . . . .
>
> Perhaps most significantly, however, despite the fact Petitioner presented evidence from a notary confirming Mr. Wilkerson signed the prepared affidavit admitting to drug ownership, when Mr. Wilkerson was called to testify at the post-conviction hearing, he would not confirm it was his signature on the affidavit and he invoked his Fifth Amendment right [to remain silent].

The trial court ultimately found that Petitioner failed to meet his burden to warrant a writ of error coram nobis. Petitioner's timely appeal follows.

## II. Analysis

### A. Petition for Post-Conviction Relief

On appeal, Petitioner contends that he is entitled to post-conviction relief because he was denied the effective assistance of counsel. Specifically, he contends that trial

counsel failed to: (1) adequately investigate Adrian Wilkerson; (2) obtain funds for and hire a fact investigator to investigate Mr. Wilkerson; (3) retain an expert witness to consult with and/or offer rebuttal testimony to the State's expert in undercover narcotics investigations; (4) inform Petitioner that Rosetta Williams and Patricia Taylor made out-of-court identifications of Petitioner driving the white Nissan SUV; (5) file a pretrial motion to suppress a suggestive single photographic identification and tainted in-court identification; and (6) ensure a unanimous jury verdict for Petitioner's conviction in Count 1 of the indictment—possession of more than twenty-six grams of cocaine with the intent to sell or deliver within a drug-free zone—by filing a motion for bill of particulars, requesting an election of offenses, and challenging the jury instruction to raise an issue of a unanimous verdict.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

In cases where a petitioner contends that trial counsel failed to present a witness in support of the petitioner's defense, the petitioner must present such witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither a trial nor an appellate judge can speculate as to whether that witness's testimony would have been favorable to the defense. *Id.* Therefore, the petitioner must "produce a material witness who . . . would have testified favorably in support of his defense if

called [at trial]. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland v. Washington*." *Id.* at 758.

"If a petitioner alleges that trial counsel rendered ineffective assistance of counsel by failing to . . . file a motion to suppress . . . the petitioner is generally obliged to present the witness or the other evidence at the post-conviction hearing in order to satisfy the *Strickland* prejudice prong." *Demarcus Sanders v. State*, No. W2012-01685-CCA-R3-PC, 2013 WL 6021415, at *4 (Tenn. Crim. App. Nov. 8, 2013) (citing *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008)), *perm. app. denied* (Tenn. Mar. 17, 2014).

### 1. Failure to adequately investigate Mr. Wilkerson

Petitioner asserts that trial counsel made no attempt to interview Mr. Wilkerson about why a speeding ticket with his name on it was found in the white Nissan SUV. Petitioner contends that Mr. Wilkerson wanted to speak to trial counsel and that Mr. Wilkerson's admission of ownership of the drugs in the SUV would have been "powerful evidence" to refute the State's argument that Petitioner was in constructive possession of the drugs in the SUV.

At the post-conviction hearing, trial counsel testified that he and Petitioner talked about Mr. Wilkerson, and trial counsel drafted an examination for Mr. Wilkerson "had [they] chosen to use that at trial." However, trial counsel explained that because criminal charges were also pending against Mr. Wilkerson, he could not have spoken to Mr. Wilkerson without his attorney present. Trial counsel informed Petitioner that he "could not foresee any circumstance where Mr. Wilkerson would claim the drugs on the [witness] stand" and that he did not believe that "would be an effective defense for [Petitioner]." Trial counsel testified that he spoke to Mr. Wilkerson's attorney at an early court appearance and asked if he could speak to Mr. Wilkerson. Trial counsel recalled, "[T]he answer was not just no but hell no." Trial counsel stated that he did not research whether Mr. Wilkerson was the owner of the SUV because

> [i]t was actually better for us at trial given the way we were proceeding if that person wasn't -- we had both [Mr.] Wilkerson who we know there was a ticket in the vehicle with his name and then potentially even somebody else. And it was our theory that the more people who could have been driving in that vehicle the more people other than [Petitioner] could have been the ones to put that . . . cocaine in there.

As to Petitioner's claim that trial counsel failed to investigate Mr. Wilkerson, the trial court found that Petitioner failed to establish deficient performance. The trial court determined:

When [t]rial [c]ounsel was questioned about this issue, he testified that he was aware of [Mr.] Wilkerson who had charges pending at the same time. Trial [c]ounsel testified he spoke with Mr. Wilkerson's counsel, . . . but [Mr. Wilkerson's counsel] advised his client would not speak with [t]rial [c]ounsel. This Court credits the testimony of [t]rial [c]ounsel. Moreover, Petitioner has failed to establish how he was prejudiced by this alleged deficiency. Information concerning Mr. Wilkerson was before the jury as evidenced in the record and Petitioner's citations thereof. Specifically, the trial record shows that [t]rial [c]ounsel cross[-]examined witnesses about Mr. Wilkerson to establish he was the owner of the [SUV].

(citation omitted).

We agree with the trial court that Petitioner failed to establish deficient performance and resulting prejudice based on this claim. Mr. Wilkerson had pending criminal charges and was represented by counsel. Trial counsel approached Mr. Wilkerson's attorney and requested that he be able to speak to Mr. Wilkerson, but he was told "no." Although Petitioner seems to suggest that trial counsel should have approached Mr. Wilkerson after Mr. Wilkerson was no longer represented by counsel, there is no evidence in the record as to when Mr. Wilkerson's charges were disposed of. In any event, trial counsel successfully informed the jury through cross-examination of several of the State's witnesses that the SUV was not registered to Petitioner, that a traffic ticket belonging to Mr. Wilkerson that was found inside the vehicle, and that Mr. Wilkerson was a known drug dealer. Trial counsel offered testimony from Ms. Rolston that Mr. Wilkerson was the owner of the SUV and that it was Mr. Wilkerson and not Petitioner who had been at the apartment complex on the day of the offense. Trial counsel also presented Ms. Phillips, who testified as an alibi witness that Petitioner had been with her at the time of the offense. We agree with the trial court's determination that trial counsel was not deficient in regards to his investigation into Mr. Wilkerson. Moreover, Petitioner has not shown prejudice resulting from trial counsel's alleged failure to properly investigate Mr. Wilkerson as the proof does not show that Mr. Wilkerson would have provided favorable material testimony if called to testify at trial. Mr. Wilkerson refused to testify under oath at the post-conviction hearing about the affidavit, his alleged ownership of the cocaine, and his alleged driving of the SUV on the day of the offense prior to Petitioner. Moreover, his refusal to answer questions under oath seriously undercuts the veracity and legitimacy of the affidavit and the claims made therein. Petitioner is not entitled to post-conviction relief on this ground.

## 2. Failure to obtain funds for and retain a fact investigator and expert witness

Petitioner contends that trial counsel was ineffective based on his failure to obtain funds to hire a fact investigator to investigate Mr. Wilkerson and an expert in undercover narcotics investigations to rebut the testimony of Lieutenant Mackall. Petitioner contends that, even though trial counsel was retained and he did not think the trial court would approve the funds, trial counsel should have requested them because Rule 13 encourages counsel representing indigent defendants to petition for necessary fact investigator and expert services. Petitioner further argues that Mr. Cothran's testimony—that the amount of money seized from Petitioner and the scales in the SUV were consistent with a user and that crack users do not always carry a crack pipe—may have changed the outcome of trial had it been presented by trial counsel.

At the post-conviction hearing, trial counsel acknowledged that he did not apply for funds to hire an investigator but stated that an investigator was not necessary because "[w]e were aware of what the officers' testimony was going to be" and that their testimony "could be handled through cross-examination." He testified that he and Petitioner did not discuss hiring an expert to rebut Lieutenant Mackall's testimony. He explained that Petitioner's family was not in the financial position to retain expert services, and trial counsel did not believe that the trial court would approve expert funds pursuant to Rule 13 of the Tennessee Supreme Court Rules as such testimony would not have concerned a medical or scientific issue. In its order denying relief, the trial court accredited the testimony of trial counsel and found no deficient performance or resulting prejudice under *Strickland*.

We agree with the trial court that Petitioner is not entitled to relief on this claim. First, Petitioner has not shown that he would have been entitled to those funds under Rule 13 had trial counsel made the request. Moreover, Petitioner presented no "fact investigator" at the post-conviction hearing, leaving this court to speculate about what benefit a fact investigator would have made to Petitioner's case. Although Petitioner presented expert testimony from Mr. Cothran at the post-conviction hearing, Mr. Cothran was still employed by the Metropolitan Police Department at the time of Petitioner's trial and would not have been available as defense expert. In addition, the information testified to by Mr. Cothran at the post-conviction hearing was similar to what trial counsel elicited from Lieutenant Mackall at trial through cross-examination. As noted by this court on direct appeal, "Lieutenant Mackall conceded that he had seen drug users, who were not sellers, with large amounts of money. Additionally, he testified that 1.41 grams of cocaine, the equivalent of 6 or 7 'hits,' was not an unreasonable amount for a user to purchase." Petitioner has not established any resulting prejudice from trial counsel's failure to request funds for and retain a fact investigator to investigate Mr.

Wilkerson and an expert witness in undercover narcotics investigations. He is not entitled to relief on this ground.

### 3. Failure to inform Petitioner of witnesses' out-of-court identifications of Petitioner

Petitioner asserts that he received ineffective assistance of counsel based upon trial counsel's failure to keep Petitioner informed about Ms. Williams and Ms. Taylor, who made out-of-court identifications of Petitioner as the driver of the SUV. Petitioner alleges that, had trial counsel informed Petitioner of the identifications earlier, Petitioner would have likely entered a plea deal with the State.

At the post-conviction hearing, Petitioner claimed that he was not made aware of the witnesses' statements until Ms. Williams testified at a 404(b) hearing, which was held on January 20, 2012, three days before his trial was set to begin. Trial counsel testified that Ms. Williams and Ms. Taylor were late-disclosed witnesses for the State. He stated that he did not learn of their statements to police until a supplemental discovery response filed by the State on December 1, 2011. Trial counsel explained that the supplemental discovery response led him to request the 404(b) hearing but that the trial court ultimately decided that the witnesses' testimony was admissible. Following the trial court's ruling, Petitioner indicated to trial counsel that he was open to a plea deal, but when trial counsel approached the prosecutor about a deal, he was informed that "all offers [were] off the table[.]"

It was unclear from trial counsel's testimony whether he discussed with Petitioner the late-disclosed witness statements before filing the 404(b) motion. Even assuming that trial counsel failed in this regard, Petitioner has not established prejudice as required under *Strickland*. Petitioner presented no proof that the State would have made an offer (or accepted an offer) to settle the case against Petitioner if Petitioner had approached the prosecutor for a deal in December, immediately after learning of the late-disclosed witnesses. Although trial counsel could have requested a continuance after the State's supplemental discovery response, trial counsel testified that requesting a trial continuance would not have been helpful to Petitioner. He explained that he had an alibi witness plus "another witness that would testify that Mr. Wilkerson was the one who had been driving the [SUV]" set to testify on Petitioner's behalf. Additionally, trial counsel believed that, based upon her testimony at the 404(b) hearing, Ms. Williams' identification of Petitioner could be challenged through cross-examination. Trial counsel testified that "it made more sense to go ahead and proceed with the trial" because, based upon his conversations with Petitioner, he did not know of any other witnesses "or anybody else we would have called to rebut" Ms. Williams and Ms. Taylor's identifications. Under these circumstances, we cannot conclude that trial counsel rendered ineffective assistance

based on the claim that counsel failed to timely inform Petitioner of Ms. Williams' and Ms. Taylor's out-of-court identifications of Petitioner.

### 4. Failure to file a motion to suppress

Petitioner next contends that trial counsel rendered ineffective assistance based on trial counsel's failure to file a pretrial motion to suppress the single photographic identification and subsequent in-court identification by Ms. Williams. Petitioner asserts that, had trial counsel been successful in suppressing the identification, Petitioner could have successfully pursued the defense strategy of denying that he had been driving the SUV, been able to settle the case, or had a "very good issue for relief" on appeal.

Regarding a possible motion to suppress the pretrial identification by Ms. Williams, the trial court found:

> Trial [c]ounsel testified that the State gave pre-trial notice of the identifications made by Ms. Williams and Ms. Taylor. Trial [c]ounsel testified the State's notice prompted him to file his 404(b) motion, which resulted in the pretrial hearing on January 20, 2012, addressing whether evidence of the outstanding warrants on harassment and the parole violation could be introduced at trial. Information about the single photo identification was placed on the record during Detective Les Carlisle's testimony at the January 20 hearing. Trial [c]ounsel testified that at the time he was aware of case law regarding single-[photo] identifications and conceded that Petitioner would benefit had the identification been suppressed, but [t]rial [c]ounsel did not believe a motion to suppress would be successful based on the evidence. This Court credits [t]rial [c]ounsel's testimony. Moreover, Petitioner has not demonstrated a suppression motion would have been meritorious . . . .

(citation and footnote omitted).

Upon review, we agree with the trial court that Petitioner has not shown that a motion to suppress would have been granted had one been filed by trial counsel. "Under the Due Process Clause of the Fifth Amendment to the United States Constitution, a witness's pretrial identification of the defendant by photograph will be suppressed 'only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *State v. Martin*, 505 S.W.3d 492, 500 (Tenn. 2016) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). If the identification procedure was unduly suggestive, the next question is whether the identification was reliable despite the undue suggestion. *See Neil v. Biggers*,

409 U.S. 188, 198-99 (1972). The United States Supreme Court has identified five factors to be considered in making this determination:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200. If, using the standard in *Biggers*, a pretrial confrontation was so impermissibly suggestive that it violated an accused's right to due process, both the out-of-court and in-court identifications are excluded. *See State v. Shanklin*, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

At the 404(b) hearing, Ms. Williams testified that Petitioner began harassing her in January 2010. When he learned that she had contacted police, Petitioner came to Ms. Williams' apartment and threatened to harm her for doing so. Petitioner shot several rounds of paintball at her door. When Ms. Williams informed Detective Carlisle that Petitioner drove around her apartment complex in several different cars, he asked her to take down the tag numbers so that Petitioner could be identified. Ms. Williams provided the detective with several tag numbers, from which Detective Carlisle was able to obtain Petitioner's name. Detective Carlisle showed Ms. Williams a photograph of Petitioner on September 30, 2010, and she positively identified Petitioner as the man who had been harassing her since January 2010. When Ms. Williams identified Petitioner, Ms. Taylor was not present and did not see the photograph.

Ms. Williams testified that she was able to recognize Petitioner on the day of the instant offenses because she had seen him ten to twelve times prior. She stated that she got a good look at him each time and that he was always in her line of sight. She testified that, on the day of the underlying crimes, she saw Petitioner arrive in the complex and leave in the same white SUV she had previously seen him driving and alerted the police.

In this case, Ms. Williams' initial identification of Petitioner was in connection to the harassment complaint and not the offenses charged in the instant case, as they had not yet occurred. Even if the identification procedure was unduly suggestive, Petitioner has failed to show under *Biggers* that Ms. Williams' identification was unreliable. Ms. Williams had ample opportunity to view Petitioner as she had seen him ten to twelve times prior to October 7, 2010. Ms. Williams stated that she was always on the lookout for Petitioner due to his behavior towards her and that she was certain in her identification of Petitioner as the man seen driving around the apartment complex in the white Nissan SUV. When she saw him on the day of the instant offenses, she

immediately alerted Detective Carlisle. Multiple other witnesses, including Detective Carlisle, identified Petitioner as the driver of the SUV that day, and after his arrest, Petitioner admitted to police that he had been driving the vehicle. Thus, Ms. Williams' identification of Petitioner was clearly reliable, notwithstanding the detective's use of a single photograph. Based on the reliability of Ms. Williams' identification and the facts and circumstances surrounding the identification procedure, trial counsel's decision not to file a suppression motion was reasonable and did not constitute deficient performance. Petitioner is not entitled to relief on this ground.

### 5. Failure to ensure a unanimous jury verdict for Count 1

Petitioner contends that trial counsel rendered ineffective assistance of counsel by failing to ensure a unanimous jury verdict for Count 1. He argues that there were twenty-four possible scenarios for the conviction because there were three quantities of cocaine from three different locations used to prosecute the offense. He contends that trial counsel should have filed a motion for bill of particulars, requested an election of offenses, and/or challenged the jury instruction on the issue of a unanimous verdict.

In making this argument, Petitioner contrasts this case with *Gregory Justice*, 2013 WL 1965999, at *1. In that case, the petitioner asserted that his counsel was ineffective because counsel failed to object to a duplicitous indictment before the trial or on appeal. *Id.* at *12. The indictment at issue charged that the petitioner "knowingly did *possess* with intent to sell or deliver .5 grams or more of a substance containing cocaine." *Id.* In rejecting the petitioner's argument, the court noted that the petitioner "was not charged with the two crimes of delivery and sale of cocaine but was charged with the separate crime of possession with the intent to sell or deliver." *Id.* (citing Tenn. Code Ann. § 39-17-417(a)(2)-(4); *State v. John Tyree Lytle*, No. E2003-01119-CCA-R3-CD, 2004 WL 941003, at *3 (Tenn. Crim. App. May 3, 2004); *State v. Angela E. Isabell*, No. M2002-00584-CCA-R3-CD, 2003 WL 21486982, at *3-4 (Tenn. Crim. App. June 27, 2003)). The court noted that the indictment charged the petitioner with one offense and that the proof showed that the petitioner possessed one bag of cocaine, and the court stated that jury unanimity concerns are not implicated when the jury considers proof of only one offense. *Id.* The court further stated that "[w]hen [a] single crime may be committed by different means, jury unanimity is not required as to the particular means or intent." *Id.* (citing Tenn. Code Ann. § 40-18-112 (2012)).

In this case, the indictment did not deny Petitioner his right to notice of the crime charged or jury unanimity. Count 1 of the indictment charged that Petitioner,

> on the 7th day of October, 2010, in Davidson County, Tennessee and before the finding of this indictment, knowingly did *possess* with intent to

sell or deliver twenty-six (26) grams or more of a substance containing cocaine, a Schedule II controlled substance on the grounds or facilities within one thousand (1,000) feet of the real property that comprises a preschool, child care agency, public library, recreational center or park, in violation of Tennessee Code Annotated § 39-17-417, and against the peace and dignity of the State of Tennessee.

(Emphasis added). At trial, TBI Agent Scott testified that the substance containing cocaine base found in Petitioner's pants weighed 1.41 grams, the crack rock found in plain view in the console of the SUV weighed 28.82 grams, and that the bag of powder cocaine found in the SUV weighed 6.8 grams. *Christopher Lee Shaw*, 2013 WL 5310489, at *5. Petitioner insists that his case is distinct from *Gregory Justice* because the cocaine he possessed was in three different containers—his pants, the SUV console, and a bag inside the SUV. While true, Petitioner is still not entitled to relief because he, like the petitioner in *Gregory Justice*, was charged with only one offense: possession with the intent to sell or deliver more than 26 grams of cocaine. The offense involved only one transaction or one criminal episode. Instead of being charged with three counts of felony drug possessions, the containers of cocaine were combined to charge Petitioner with one offense. When only a single transaction is at issue, an election of offenses is not necessary. *See State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). Here, there was no issue involving jury unanimity because the jury considered proof of only one felony drug offense.

Because the indictment in this case did not deny Petitioner his right to notice of the crime charged or jury unanimity, Petitioner has not shown that trial counsel was deficient or that he was prejudiced by trial counsel's failure to file a motion for bill of particulars, request an election of offenses, and/or challenge the jury instruction on the issue of a unanimous verdict. Petitioner is not entitled to relief on this issue.

*B. Petition for Writ of Error Coram Nobis*

On appeal, Petitioner acknowledges that he filed the petition for writ of error coram nobis outside the statute of limitations but argues that due process should toll the statute of limitations because Mr. Wilkerson did not execute the affidavit until after the limitations period had expired. He asserts that the admissions in the affidavit were unavailable at the time of trial and are newly discovered evidence which "likely would have changed the outcome of the trial." The State responds that because Petitioner failed to demonstrate that he is entitled to relief from the statute of limitations, the trial court properly denied the petition for the writ.

Tennessee Code Annotated section 40-26-105 provides relief in criminal cases by petition for error coram nobis and states in pertinent part:

> The relief obtainable by this proceeding shall be confined to error dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b) (2016). A petition for writ of error coram nobis should recite:

> (a) the grounds and nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) the petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought by the petitioner.

*State v. Hart*, 911 S.W.2d 371, 374-75 (Tenn. Crim. App. 1995) (internal citations and quotation marks omitted).

The writ of error coram nobis is "an *extraordinary* procedural remedy," providing relief in only a limited number of cases. *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (emphasis in original). "The purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *Hart*, 911 S.W.2d at 374 (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1966)). The decision of whether to grant or deny a petition for writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007); *Hart*, 911 S.W.2d at 375. Before granting relief, the evidence must establish, and the trial court must find, "that the subsequently or newly discovered evidence 'may have resulted in a different judgment had it been presented at the trial.'" *Hart*, 911 S.W.2d at 375 (quoting Tenn. Code Ann. § 40-26-105). The newly discovered evidence must be admissible and credible because the ultimate issue is whether the result at trial would have been different with all relevant evidence presented. *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012), *overruled on other grounds by Nunley v. State*, 552 S.W.3d 800, 828 (Tenn. 2018). Accordingly, the

trial court must be "reasonably well satisfied" with the veracity of the new evidence. *Vasques*, 221 S.W.3d at 527.

Petitions for writ of error coram nobis are subject to a one-year statute of limitations. Tenn. Code Ann. § 27-7-103 (2016). "The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *Mixon*, 983 S.W.2d at 670), *overruled on other grounds by Nunley*, 552 S.W.3d at 828. Calculating the statute of limitations in this manner is consistent with the "longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim." *Mixon*, 983 S.W.2d at 670; *see also Harris*, 301 S.W.3d at 144.

Recently, our supreme court determined that "compliance with the timely filing requirement . . . is an essential element of a coram nobis claim." *Nunley*, 552 S.W.3d at 828. However, a petitioner can request equitable tolling of the limitations period. *Id.* To determine whether due process requires tolling, courts must balance the State's interest in preventing "stale and groundless" claims against the petitioner's interest in having a hearing to present newly discovered evidence which may have led the jury to a different verdict if it had been presented at trial. *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001). To balance these interests, courts should use a three-step analysis:

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the ground for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995); *see also Harris*, 301 S.W.3d at 145. Likewise, "the coram nobis petition must be filed within a time period that 'does not exceed the reasonable opportunity afforded by due process.'" *Nunley*, 552 S.W.3d at 830 (quoting *Sample v. State*, 82 S.W.3d 267, 275 (Tenn. 2002)); *see Workman*, 41 S.W.3d at 103. Whether due process considerations require tolling the statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness. *Harris*, 301 S.W.3d at 144 (citing *Brown v. Erachem Comilog, Inc.*, 231 S.W.3d 918, 921 (Tenn. 2007)).

In this case, the trial court found that the petition was not timely filed, noting that "Petitioner's judgment[s] became final in the trial court after the verdict in early 2012,

but the petition for a writ of error coram nobis was not filed until October 25, 2016, during the pendency of the post[-]conviction proceeding." The trial court considered whether principles of due process precluded the use of the statute of limitations to bar Petitioner's coram nobis claim but determined that "[n]othing in the record implicates any due process concerns that would require tolling the statute of limitations[.]" The trial court reasoned:

> [T]he evidence was not "later-arising" since it was available pretrial and during the statutory limitations period . . . . Likewise, the "evidence" concerning [Mr.] Wilkerson does not constitute "newly discovered evidence." The parties knew of [Mr.] Wilkerson prior to trial and he was referenced during the trial testimony.

Although the identity of Mr. Wilkerson was known to Petitioner at the time of trial, Petitioner asserts that the grounds for relief "actually arose after the limitations period would normally have commenced" because he did not have access to Mr. Wilkerson's affidavit and the admissions in the affidavit until January 2016.

Even assuming that Petitioner is entitled to due process tolling, we conclude that the trial court did not abuse its discretion in denying coram nobis relief. The trial court rejected Petitioner's claim that Mr. Wilkerson's affidavit qualified as substantive admissible evidence which may have resulted in a different judgment had it been presented at trial. The trial court noted that "despite the fact that Petitioner presented evidence from a notary confirming Mr. Wilkerson signed the prepared affidavit admitting to drug ownership, when Mr. Wilkerson was called to testify at the post-conviction hearing, he would not confirm it was his signature on the affidavit[,]" and Mr. Wilkerson invoked his Fifth Amendment right to remain silent. Newly discovered evidence must be credible because the ultimate issue is whether the result at trial would have been different with all relevant evidence presented. *Wilson*, 367 S.W.3d at 235. Here, the trial court recognized that Mr. Wilkerson's refusal to answer questions about the case under oath undercut the veracity and legitimacy of the information contained in the affidavit. Because the trial court was not "reasonably well satisfied" with the veracity of the new evidence, the court did not abuse its discretion by denying coram nobis relief.

### III. Conclusion

After a thorough review of the facts and applicable case law, we affirm the trial court's denial of relief.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 30 -